1              HONORABLE TIMOTHY W. DORE

2     HEARING DATE:  WEDNESDAY, SEPTEMBER 12, 2018
      HEARING TIME:  11:00 A.M.
3     LOCATION:  SEATTLE, COURTROOM 8106
      RESPONSE DATE:  AT TIME OF HEARING

4

5

6

7

8              UNITED STATES BANKRUPTCY COURT
               WESTERN DISTRICT OF WASHINGTON
9
      In re
10                                           Lead Case No. 18-13512
      OCEAN SERVICES, LLC,[1]
11                                           EMERGENCY MOTION FOR INTERIM
                        Debtors.             ORDER:
12                                           (1) AUTHORIZING USE OF CASH
                                             COLLATERAL AND GRANTING
13                                           ADEQUATE PROTECTION,
                                             (2)  APPROVING POST-PETITION
14                                           LOAN FACILITY, AND
                                             (3) SETTING A FINAL HEARING
15

16            Ocean Services, LLC et al., the above captioned debtors-in-possession ("Debtors"), move the

17    Court pursuant to sections 105, 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C.

18    §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of

19    Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 4001-3, and 9013-1(d)(2)(E) of the Local

20    Rules of Bankruptcy Procedure for the Western District of Washington (the "Local Bankruptcy

21            [1] The Debtors are Ocean Services, LLC, Bankruptcy Case No. 18-13512, Ocean Carrier Holding, LLC,
22    Bankruptcy Case No. 18-13513, Ocean Carrier Holding S. de R.L. de C.V., Bankruptcy Case No. 18-13514, Ocean
      Constructor Holding, LLC, Bankruptcy Case No. 18-13515, Ocean Intrepid Holding, LLC, Bankruptcy Case No. 18-
23    13516, Ocean Starr Holding, LLC, Bankruptcy Case No. 18-13517, and Stabbert Maritime Holdings, LLC, Bankruptcy
      Case No. 18-13518.

EMERGENCY MOTION RE: CASH COLLATERAL USE
AND POSTPETITION LOAN FACILITY – Page 1

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Rules"), for the entry of an interim Order (1) authorizing the Debtors' use of cash collateral in which the Senior Secured Lenders (defined herein) assert a security interest; (2) authorizing the Debtors to grant adequate protection in favor of the Senior Secured Lenders on account of the Debtors' use of cash collateral; (3) approving a postpetition loan facility; and (4) setting a final hearing. This motion is based upon the files and records herein, the accompanying Declarations of Daniel W. Stabbert and Kelly Allison, the exhibits thereto, and the consent of the Senior Secured Lenders described herein.

## I.  FACTUAL BACKGROUND

### A.  The Debtors and the Events Leading to Bankruptcy

Founded more than 25 years ago and headquartered in Seattle, the Stabbert Maritime group of entities (the "Stabbert Group") owns and charters three large multi-purpose specialty construction vessels primarily to Mexican entities contracted to survey, maintain and repair pipeline and oil platform infrastructure in the Gulf of Mexico. Stabbert Decl.; Allison Decl. Seven of the Stabbert Group companies filed Chapter 11 cases on the Petition Date, and those cases have been administratively consolidated.

The Debtors include the companies that own and operate the four vessels described herein, as well as Stabbert Maritime Holdings, LLC ("Stabbert Maritime"), which owns the other debtor entities and is the borrower on secured loans owed to the Senior Secured Lenders described in Section D.1., below.

Historically, the Stabbert Group has generated annual gross revenues in excess of $50,000,000 when its vessels are being fully utilized in a healthy oil and gas market. For instance, in 2015, gross revenues totaled approximately $56,000,000, with EBITDA of $22,000,000.

The well-documented downturn in the oil and gas industry over the last few years created challenges for supporting industries such as the Stabbert Group. Beginning in late 2014, oil prices

EMERGENCY MOTION RE: CASH COLLATERAL USE
AND POSTPETITION LOAN FACILITY – Page 2

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

began a significant decline, dropping from a high of more than $100 per barrel in July 2014 to below

$30 per barrel in February 2016. Stabbert Decl.; Allison Decl. The industry has improved since that

valley at a fairly steady, gradual pace. Oil prices continue to strengthen. Id.

The heart of the Debtors' business, chartering their large commercial vessels, has historically

been focused in the Gulf of Mexico. Stabbert Decl.; Allison Decl. Over the last five years, Mexican

companies that, in turn, have contracts and business dealings with Pemex, the Mexican state-owned

petroleum company, have typically chartered the Stabbert Group vessels. The industry's downturn

lagged the dramatic decrease in oil prices, so that it was only in the past two years that the Stabbert

Group's vessel utilization rates have been negatively impacted. Id. While charter opportunities were

sparse in 2016 and 2017, due to the natural lag behind the oil price recovery, the charter market has

noticeably improved, and new opportunities are now presenting themselves. Id.

Despite the challenges it has faced, the Stabbert Group has been able to continue to operate its

business interests while keeping its vendors and suppliers generally current. In addition, it has

substantially reduced its secured bank debt from almost $57,900,000 in January 2016 to less than

$42,000,000 today. Stabbert Decl.; Allison Decl. This secured bank debt is owed to a group of

lenders comprised of Columbia State Bank ("Columbia Bank"), Washington Federal, National

Association, Umpqua Bank, and MUFG Union Bank, N.A. (together, the "Senior Secured Lenders").

The debt is secured by preferred ship mortgages against the Stabbert Group vessels discussed in detail

below and liens on all or substantially all of the Debtors' other assets. Stabbert Maritime is the

borrower, and the other Debtors are guarantors of these loans. Columbia Bank serves as the

administrative and collateral agent for the Senior Secured Lenders (the "Agent").

Recently, the Debtors struggled to make the scheduled principal payments on the secured bank

debt due to the lack of charter opportunities and reduced day rates for the vessels during the last

EMERGENCY MOTION RE: CASH COLLATERAL USE
AND POSTPETITION LOAN FACILITY – Page 3

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2206 20161 ci07f0000g
Case 18-13512-TWD    Doc 11    Filed 09/07/18    Ent. 09/07/18 17:36:38    Pg. 3 of 23

couple of years.  In late 2016, Stabbert Maritime defaulted under certain covenants in place under the loan documents.  In response, the Senior Secured Lenders, Stabbert Maritime and the other Debtors entered into a forbearance agreement and a series of amendments thereto beginning in May 2017.  Stabbert Maritime was able to continue to make meaningful principal reductions and pay interest current during 2017.  By the end of 2017, however, it was clear that Stabbert Maritime would not be in a position to make ongoing scheduled principal payments, and continuing to operate under forbearance agreements was no longer a viable option for the Senior Secured Lenders or Stabbert Maritime.

Beginning in early March 2018, the Debtors and Senior Secured Lenders began negotiations in an attempt to reach an agreed restructure of the loans.  After months of negotiations, the parties reached agreement on a Loan Restructuring Terms Sheet (the "Term Sheet"), which was executed effective July 11, 2018.  The Term Sheet provides for agreed restructure terms to be implemented through Chapter 11 cases.  Thus, the Debtors have filed these cases primarily to restructure their secured obligations owed to their Senior Secured Lenders, as well as other liabilities to third-party creditors.  Stabbert Decl.; Allison Decl.

**B.**     **The Vessels**

The Stabbert Group owns three large multi-purpose specialty construction vessels:  the M/V Ocean Intrepid (the "Intrepid"), the M/V Ocean Constructor (the "Constructor"), the M/V Ocean Carrier (the "Carrier"), as well as the M/V Ocean Starr (the "Starr"), a science research vessel (each, a "Vessel," together, the "Vessels").   Stabbert Decl.; Allison Decl.

**1.**     **Valuation.**  In February 2018, the Senior Secured Lenders, which hold preferred ship mortgages against the Vessels, obtained independent third party valuations of the Vessels.  Following is the fair market value of each vessel based on those valuations:

EMERGENCY MOTION RE: CASH COLLATERAL USE
AND POSTPETITION LOAN FACILITY – Page 4

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

| Vessel | Fair Market Value |
|--------|-------------------|
| Intrepid | $ 49,571,000 |
| Constructor | $ 34,986,205 |
| Carrier | $ 16,480,000 |
| Starr | $  1,600,000 |
| **Total** | **$102,637,205** |

Fair market values generally reflect what a willing buyer would pay a willing seller when neither is compelled to buy or sell.

Stabbert Decl.; Allison Decl.

The following is the orderly liquidation value based upon the same valuations:

| Vessel | Orderly Liquidation Value |
|--------|---------------------------|
| Intrepid | $30,528,000 |
| Constructor | $24,490,343 |
| Carrier | $10,148,000 |
| Starr | $ None provided |
| **Total**: | **$65,166,343** |

Orderly Liquidation Values generally reflect the amount that would typically be realized from a liquidation sale, given a reasonable time to find a buyer, with the seller being compelled to sell as of a specific date.  Stabbert Decl.; Allison Decl.

2.      **Ownership, Operations and Status.**  Following is a summary of the owner, general description and status of each Vessel:

a.      **Intrepid**

Owner: Ocean Intrepid Holding LLC ("Ocean Intrepid").

General Description:  The Intrepid is a 381 foot 14,000 horsepower self-propelled construction barge equipped with redundant dynamic positioning systems ("DP2"), 17,728 square feet of open deck space and accommodations for 267 people.  The Intrepid's equipment includes a 400 metric ton crane capable of working surface projects to 203 feet in height and subsea projects to over

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2206 20161 ci07f0000g

9,000 feet of depth, helicopter pad, and a 978 square foot moon pool for supporting sub-sea operations. The Intrepid supports maintenance and repair operations on existing oil and gas platforms and is capable of supporting topside and subsea construction including pipeline installations world-wide.

Status of Vessel: The Intrepid is currently under charter to Demar Instaladora Y Constructora, S.A. De C.V. ("Demar"), in support of Demar's ongoing contract with Pemex. The charter to Demar commenced in February 2018 and is scheduled to last a year, with Demar's option to extend the charter for an additional year. The amount paid per day by Demar under the charter is $29,664, except from December 21st through February 20th when the rate is reduced to $17,040. This is called the "day rate." It costs approximately $15,000/day (excluding taxes) to operate the Intrepid, thus the daily net cash to the Stabbert Group before taxes is over $14,000/day. Stabbert Decl.; Allison Decl.

**b. Constructor**

Owner: Ocean Constructor Holding, LLC ("Ocean Constructor").

General Description: The Constructor is a 413 foot 18,000 horsepower vessel equipped with redundant dynamic positioning systems, 17,760 square feet of open deck space, and accommodations for 200 people. The Constructor's equipment includes a 300-ton crane capable of working surface projects to 210 feet in height and sub sea projects to over 7,000 feet in depth, a 25-ton crane, helicopter pad, dual moon pools to support sub-sea operations, two Triton diving support vehicles ("ROVs"), and an internal rotating carousel that can accommodate 2,200 tons of tubing and or fiber optic cables for sub sea installations. The Constructor supports maintenance and repair operations on existing oil and gas platforms and is capable of supporting topside and subsea operations including pipeline and fiber optic installations world-wide.

EMERGENCY MOTION RE: CASH COLLATERAL USE
AND POSTPETITION LOAN FACILITY – Page 6

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Status of vessel:  The Constructor is currently under charter with to Central de Desarrollos Marinos S.A. de C.V. ("Protexa") for a period of 120 days, which commenced on July 26, 2018, at a day rate of $32,500.  Protexa has the right to extend the charter.  The daily cost to operate the Constructor is approximately $15,000 (excluding taxes), with a daily net cash benefit to the Stabbert before taxes of approximately $17,500.  Stabbert Decl.; Allison Decl.

    **c.**    **Carrier**

Owner:  Ocean Carrier Holding S. de R.L. de C.V. ("Ocean Carrier Mexico")

General Description:  The Carrier is a 270 foot, 12,000 horsepower vessel equipped with redundant dynamic positioning systems (DP2) with open deck area of over 5,000 square feet and accommodations for 148 people.  The Carrier's equipment includes a 150-ton crane capable of working surface projects to 135 feet in height and sub-sea projects to over 1,500 feet in depth, a 15-ton crane, a 144 square foot moon pool for supporting diving operations, and a helicopter pad.  The Carrier has supported sandblasting and painting of oil and gas platforms, subsea dredging, subsea surveying and coring, and diving operations.

Status of vessel:  Pursuant to a pre-petition agreement with the Senior Secured Lenders, the Carrier is currently listed for sale with Marcon International, Inc. at a listing price of $16.5 million.  In addition, the Carrier began a charter with Aqueos on April 24, 2018 in support of a contract with Pemex.  The charter was extended through September 15, 2018 unless earlier terminated by Aqueos' client with minimum 3 days' notice.  The day rate of the charter is currently $22,000.  The daily cost to operate the Carrier is approximately $16,000 (excluding taxes), with a daily net cash benefit to the Stabbert Group of approximately $6,000 before taxes.  Stabbert Decl.; Allison Decl.

///

///

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2206 20161 ci07f0000g

1      **d.**     **Starr**

2      <u>Owner</u>: Ocean Starr Holding, LLC ("<u>Ocean Starr</u>").

3      <u>General Description</u>: The Starr is a 171-foot science research vessel with

4 accommodations for 36 people, temperature controlled aquaria and line specimen rooms, dark room,

5 data process lab and sophisticated hydrographic and oceanographic deck machinery.

6      <u>Status of vessel</u>: The Starr is not currently under charter. There are ongoing efforts to

7 sell the Starr. Stabbert Decl.; Allison Decl.

8      Multiple-purpose specialty vessels, such as the Intrepid, the Constructor, and the Carrier, are

9 highly regulated and require technical sophistication to operate. Their propulsion systems interface

10 with the computer programs within their dynamic positioning systems to allow them to hold a position

11 in spite of wind, waves, and current within a meter and not move. Stabbert Decl. This unique

12 capability allows these vessels to be used alongside critical structures as close as one meter for

13 performing tasks and to hold specific positions while working subsea projects, including diver and

14 remote operated vehicle support. <u>Id</u>. Their dual redundancy means they can lose propulsion units,

15 main generators, and even positioning computers and still maintain their working position to within

16 one meter. <u>Id</u>.

17      With the recent recovery and stabilization of oil prices, oil dependent nations and companies

18 have seen their oil fields becoming profitable again. Stabbert Decl., Allison Decl. As discussed

19 below, the large multi-purpose specialty construction vessels are once again under charter in the

20 Mexican Gulf after extensive periods of inactivity. This recent charter activity reflects the continuing

21 recovery of the Mexican oil and gas industry. <u>Id</u>. In addition, it is expected that Mexico will continue

22 to be a growing market for expanding oil and gas activity due, in part, to a December 2013

23 Constitutional Amendment that ended the Mexican Government's monopoly on oil and natural gas

EMERGENCY MOTION RE: CASH COLLATERAL USE
AND POSTPETITION LOAN FACILITY – Page 8

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

1   extraction/production which, in turn, led to sales of offshore leases to multi-national oil companies for

2   deep water development.  This change allows private investment in the Mexican energy sector.  With

3   its extensive operating history and local presence in Mexico, the Stabbert Group is well positioned to

4   benefit from the recovery of the market in Mexico, both within the national energy sector as well as

5   supporting multi-national offshore development.  In addition to Mexico, other areas around the world

6   create demand for the vessels, including Africa, Asia, and India, all of which are experiencing market

7   rebounds similar to that in Mexico.

8       The profitability of the Vessels depends on day rate and utilization rate.  Day rate is the daily

9   rate paid under a charter agreement for a vessel.  Utilization rate refers to a vessel's days under

10  charter.  At this time, the long-term charters of both the Intrepid and the Constructor signal healthier

11  financial times.  While the day rates for both are currently in the $30,000 range, the industry's

12  continued recovery can reasonably be expected to increase day rates to the levels seen in 2015 and

13  2016, which hovered in the $45,000 and greater range for vessels like the Intrepid and Constructor.

14  Since the daily operating costs for these vessels generally run approximately $15,000 per day

15  regardless of the day rate, the cash benefits to the Stabbert Group will be dramatic as day rates return

16  to more normalized levels.

17  **C.**     **Structure of Stabbert Group and its Operations**

18      Together, the Debtors are seven affiliates that collectively own and operate the Vessels, and

19  provide support services to the Vessels.  Stabbert Maritime owns the following Vessel-owning

20  Debtors:  Ocean Intrepid, Ocean Constructor, Ocean Starr, and Ocean Carrier Holding, LLC (which

21  owns 100% of Ocean Carrier Mexico).  Stabbert Maritime also owns Debtor Ocean Services, the

22  entity that provides the operational support for charter of the Intrepid and Constructor, including

23

EMERGENCY MOTION RE: CASH COLLATERAL USE
AND POSTPETITION LOAN FACILITY – Page 9

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2206 20161 ci07f0000g

crewing, port engineer and technical services, contracting with vendors/third parties, and other similar functions.

Although only seven companies in the Stabbert Group are debtors in these cases, the proposed Interim Order filed herewith, including the Budget attached to it, addresses all of the cash flows of the companies in the Stabbert Group, other than those of Stabbert Yacht and Ship Holding, LLC and Stabbert Marine and Industrial, LLC, which own and operate a shipyard. Such other Stabbert Group companies have agreed that the terms of the Interim Order, and the Budget shall be binding on them as if they were party to such Interim Order. This is reflected in the Plan Support Agreement entered into by the Senior Secured Lenders and the Stabbert Group companies to reflect the agreed restructure to be effectuated in these cases. A Motion to Assume the Plan Support Agreement has been filed with the Court, to be set at a date and time determined by the Court.

Historically, Stabbert Maritime has been the borrower of funds from the Senior Secured Lenders and those funds are then used among the Stabbert Group entities to fund their operations. In effect, the Stabbert Group acts as a cohesive and connected enterprise, and the Senior Secured Lenders have loaned to that enterprise and are secured by substantially all of the assets owned by that enterprise. Allison Decl.

**D. Overview of Debt Structure**

**1. Revolving LOC Facility.** Debtor Stabbert Maritime is the borrower on the reducing revolving line of credit facility in place with the Senior Secured Lenders (the "Revolving LOC Facility"), with a balance of $41,775,931 as of the Petition Date. Due to certain financial covenant default that occurred in 2017, this is no longer a revolving facility, and the Debtors are not able to reborrow amounts repaid to the Senior Secured Lenders. The terms of the Revolving LOC Facility are set forth in various loan documents, including the Third Amended and Restated Credit Agreement

EMERGENCY MOTION RE: CASH COLLATERAL USE
AND POSTPETITION LOAN FACILITY – Page 10

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

dated as of January 20, 2016, between Debtor Stabbert Maritime as borrower and the Senior Secured Lenders as Lenders, and as to which Columbia Bank serves as Administrative Agent and Collateral Agent ("Agent") for the Senior Secured Lenders (the "Prepetition Credit Agreement").

Stabbert Maritime is the sole borrower under the Prepetition Credit Agreement. The remaining Debtors are Guarantors. The Prepetition Credit Agreement is secured by preferred ship mortgages against all of the Vessels. As detailed above, the current fair market value of the Vessels exceeds $102,000,000, and the Orderly Liquidation Value of the Vessels exceeds $65,000,000. In addition, the Senior Secured Lenders assert, and the Debtors do not dispute, that the Revolving LOC Facility is secured by blanket security interests on all or substantially all of the other assets of the Debtors, in addition to the Vessels.

Despite the steep industry challenges detailed above, the Stabbert Group has substantially reduced the Prepetition Credit Agreement by more than $16,000,000 from its maximum principal balance of $57,900,000 in January 2016. Interest at the non-default rate under the obligations owing to the Senior Secured Lenders is current. Due to a covenant default in late 2016, the Debtors and the Senior Secured Lenders have operated under a forbearance agreement since mid-2017, which provides for the accrual of interest at the default margin above the note rate. The marginal default interest continues to accrue without payment.

**2.    Intercompany Accounts.** As noted above, Stabbert Maritime is the sole borrower under the Prepetition Credit Agreement. As it received the Prepetition Credit Agreement loan proceeds, it distributed the loan proceeds to the various entities throughout the Stabbert Group to acquire and improve the Vessels and fund operations, as contemplated by the loan terms. This was the anticipated use and flow of funds under the terms of the Revolving LOC Facility. In doing so, and

EMERGENCY MOTION RE: CASH COLLATERAL USE
AND POSTPETITION LOAN FACILITY – Page 11

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

1 as funds are moved among the Stabbert Group entities, intercompany account balances have been

2 maintained.

3 Certain Stabbert Group entities manage the operations and/or provide administrative services

4 to other Stabbert Group entities. For instance, Ocean Services manages the operations of both the

5 Intrepid and the Constructor. Thus, funds flow between Ocean Services and the owners of those

6 vessels, Ocean Intrepid and Ocean Constructor.

7 In addition, non-debtor, Stabbert & Associates, Inc. ("Stabbert Associates") provides

8 administrative services to Ocean Services, as do several other non-debtor Stabbert Group entities.

9 Thus, funds move between Stabbert Associates, Ocean Services and other Stabbert Group entities, and

10 the Budget assumes that this will continue post-petition in the ordinary course and consistent with

11 customary practices pre-petition. As noted above, except for Stabbert Yacht and Ship Holding, LLC

12 and Stabbert Maritime and Industrial, LLC, all of the Stabbert Group companies' cash flows are

13 included in and subject to the Budget, such that funds will continue to move among the companies

14 during this case consistent with the Budget and the historical and customary manner of doing

15 business. The intercompany accounts reflect the operating reality of the Stabbert Group enterprise.

16 Funds move in the ordinary course of business based primarily on the function of each entity.

17 **3.    Substantial Financial Support From Principals**

18 As the Debtors experienced the financial challenges caused by the oil and gas industry's

19 downturn, and as a condition to the Senior Secured Lenders' continued forbearance, the Stabbert

20 Group's principal and founder, Daniel W. Stabbert, and his wife Cheryl Stabbert, have provided

21 substantial financial support to allow the Debtors to continue to operate. The Stabberts have provided

22 over $4,000,000 in subordinated loans, which have, in turn, facilitated the Debtors' ability to

23 substantially reduce the loan obligations to the Senior Secured Lenders and to generally remain

EMERGENCY MOTION RE: CASH COLLATERAL USE
AND POSTPETITION LOAN FACILITY – Page 12

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

current with vendors and suppliers. The Senior Secured Lenders have waived certain covenants relating to the Prepetition Credit Agreement and consented to the grant of a subordinate mortgage on the Constructor in connection with these loans by the Stabberts.

The Stabberts are willing to continue their support of the Debtors, if needed, during this Chapter 11 case (and have agreed to do so pursuant to the terms of the restructuring agreement with the Senior Secured Lenders), in the form of a post-petition loan in the amount of $1,350,000, which will be subordinated to payment of the obligations to the Senior Secured Lenders. The terms of the post-petition loan are discussed in further detail below.

### 4. Ordinary Course Vendors/Suppliers Owed Less Than $1,000,000.

Much as the Stabbert Group has been able to significantly reduce the principal balance of the Revolving LOC Facility, despite the industry challenges it faced, so have the Debtors remained generally current with its vendors and suppliers. As of the Petition Date, the Debtors owed its vendors and suppliers less than $1,000,000. This modest payables balance reflects a well-managed and current-pay approach with vendors and suppliers. A number of these vendors and suppliers do business with the Vessels and may hold maritime liens for necessaries against the Vessels. Necessaries liens arise automatically against a vessel, are secret liens (meaning there is no filing requirement), and are generally junior to preexisting preferred ship mortgages.

### E. Specific Information Regarding Secured Debt/Collateral

The Revolving LOC Facility is evidenced by, among other things, the Prepetition Credit Agreement. Allison Decl., Ex. C. Pursuant to a security agreement and UCC-1 filed with the Washington Department of Licensing, the Prepetition Credit Agreement is secured by (a) a first position lien on assets of Debtor Stabbert Maritime; (b) to secure guaranties, assets of certain of the

EMERGENCY MOTION RE: CASH COLLATERAL USE
AND POSTPETITION LOAN FACILITY – Page 13

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

other Debtors; and (c) first position liens on all of the Vessels pursuant to Preferred Ship Mortgages (the "Prepetition Credit Agreement Collateral"). Allison Decl., Exs. D to K.

**F.** **Use of Cash Collateral and Adequate Protection**

The Debtors require, and the Senior Secured Lenders have consented to, the immediate use of the cash proceeds of the Prepetition Credit Agreement Collateral (the "Cash Collateral") to continue uninterrupted operations for the benefit of their creditors and their estates, thereby avoiding immediate and irreparable harm to their business pending a final hearing pursuant to Bankruptcy Rule 4001(b)(2). Allison Decl. The Debtors are unable to obtain unsecured credit to fund their continued operations. Id. The Debtors seek to use Cash Collateral in accordance with the budget attached as Exhibit A to the Allison Declaration (the "Budget"). Without use of Cash Collateral, the Debtors will be unable to pay their ongoing operating expenses, including payroll, and will thus be unable to continue ongoing business operations. Allison Decl.

**1.** **Adequate Protection Lien**

Pursuant to §§ 361 and 363 of the Bankruptcy Code, the Debtors propose to provide adequate protection of the interests of the Senior Secured Lenders, by granting the Senior Secured Lenders liens (the "Adequate Protection Liens) in (a) assets of the same kind, type, and nature as the Prepetition Credit Agreement Collateral ("Prepetition Collateral") in which the Senior Secured Lenders held liens as of the Petition Date and which are acquired after the Petition Date (the "Postpetition Collateral"); and (b) all proceeds of the Postpetition Collateral, to secure the amount of any diminution in the Senior Secured Lenders' interests in the subject Prepetition Collateral as a result of the Debtors' use of Cash Collateral.

///

///

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

## 2. Payment of Interest and Lender Fees

The Debtors shall pay to the Senior Secured Lenders interest at the non-default rate designated in the applicable Prepetition Credit Agreement Documents on the interest payment dates set forth in the Prepetition Credit Agreement Loan Documents. The Debtors shall also set aside $10,000 per month during the Bankruptcy Case for the purpose of paying the Senior Secured Lenders' financial and legal advisory fees and expenses ("Lender Fee Account"), and shall use these funds, to the extent available, to pay those fees during the case. The funds in the Lender Fee Account are not intended to limit the Lenders' financial and legal advisory fees and expenses nor the Lenders' rights to payment from the Debtors for such fees and expenses.

## 3. Reporting

The Debtors shall provide the Senior Secured Lenders with financial and other reporting in compliance with the Proposed Order submitted herewith and the requirements of the Bankruptcy Code and Rules.

## 4. Insurance

The Debtors shall continue to maintain insurance on their assets as the same existed as of the Petition Date.

## 5. Superpriority Administrative Expense Claim

Under § 507(b) of the Bankruptcy Code, all obligations subject to the Adequate Protection Lien have priority in payment over all other administrative expenses of the estate other than the Professional Fund (as defined herein), to the extent that the Adequate Protection Liens are insufficient to compensate the Senior Secured Lenders for any diminution in the value of their interests as a result of the Debtors' use of Cash Collateral.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2206 20161 ci07f0000g

**G. Proposed Post Petition Financing.**

In addition to the use of Cash Collateral, the Debtors may need to borrow funds on a postpetition basis in order to meet the projected expenditures as set forth in the Budget. Allison Decl. Prior to the Petition Date, the Debtors successfully negotiated postpetition financing (the "DIP Loan") upon the terms and conditions set forth in the Credit Agreement attached as Exhibit B (the "DIP Agreement") and the Joint Escrow Instructions attached as Exhibit C (the "DIP Escrow Instructions") to the Allison Declaration. Daniel W. Stabbert and Cheryl Stabbert (together, the "DIP Lender") agreed to make and provide the DIP Loan upon the terms and conditions set forth in the DIP Agreement and the DIP Escrow Instructions. Following is a summary of the material terms:

  i.    **Loan Amount:** $1,350,000.

  ii.   **Conditions to Borrowing:** The DIP Loan is fully committed and available to the Debtors on an "as needed" basis.

  iii.  **Maturity Date:** Earlier of: a) the effective date of Debtors' Chapter 11 Plan; b) sale of all or substantially all of the Borrower's assets; c) appointment of a Trustee in this Bankruptcy Case; or d) conversion of this Bankruptcy Case to a case under Chapter 7.

  iv.   **Interest Rate:** Prime plus 3.25% paid monthly in arrears

  v.    **Fees:** None

  vi.   **Collateral:** Subordinated preferred ship mortgages against the Vessels, junior to the Liens of the Senior Secured Lenders and to any valid, pre-existing liens against the Vessels as of the Petition Date.

  vii.  **Subordinate to Senior Secured Lenders:** The DIP Loan shall be subordinate to the Prepetition Credit Agreement obligations owed to the Senior Secured Lenders and shall be subject to the Intercreditor and Subordination Agreement entered into on October 17, 2017, by the DIP Lender and the Agent, on behalf of the Senior Secured Lenders ("Subordination Agreement").

EMERGENCY MOTION RE: CASH COLLATERAL USE
AND POSTPETITION LOAN FACILITY – Page 16

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

vi. **Revolving:** Revolving line of credit

vii. **Priority:** Claim under § 507(b) of the Bankruptcy Code

viii. **Prepayment:** No penalty

ix. **Escrow:** DIP Loan funds have been deposited into an escrow account maintained by Wanda Reif Nuxoll, P.S. ("<u>DIP Escrow</u>"). The Debtors shall have the right to receive draws and make payments from the DIP Escrow. [Agent shall be entitled to receive a screen shot of the account balance and activity from the DIP Escrow on two days' written request delivered to the DIP Escrow.

Allison Decl., Ex. B.

Once the Debtors determined that postpetition financing would be necessary, they began discussions with Daniel W. Stabbert. Allison Decl. Due to the nature of the Debtors' business and industry, the Senior Secured Lenders and the DIP Lender were the only likely parties to provide postpetition financing. Allison Decl. During these negotiations, Bush Kornfeld represented the Debtors. Allison Decl., Stabbert Decl. The law firm of Cairncross & Hempelmann, P.S. represented the DIP Lender. <u>Id</u>. The negotiations involved specific terms on which each party would be willing to provide postpetition financing, and spanned the better part of two weeks. <u>Id</u>. Counsel proposed and negotiated an escrow to hold the DIP Loan funds, to be disbursed as approved by the Bankruptcy Court.

In addition to providing the DIP Loan, Daniel Stabbert has agreed to continue to allow the Debtors to utilize an American Express ("AMEX") card maintained in his name to address two specific operational/financial issues. This is effectively in the form of an expense advance and reimbursement. Specifically, the use of this AMEX card allows the Debtors to book crew travel,

EMERGENCY MOTION RE: CASH COLLATERAL USE
AND POSTPETITION LOAN FACILITY – Page 17

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

which requires a credit card, and to address vessel vendors who insist on immediate payment when a credit card is the most efficient mechanism. The Debtors' monthly expenses on this AMEX card typically run $50,000-$150,000. The Debtors propose that they be authorized to use this method of advancing expenses with payment of the expenses directly to AMEX each month.

**H.**     **Professional Fund**

The Budget provides for a fund ("Professional Fund") to pay the post-petition, allowed fees/costs of **all** professionals retained in this Chapter 11 case, whether by the Debtors or an unsecured creditors committee ("Committee"), assuming that one will be formed. The purpose of the Professional Fund is to assure that all estate professionals are treated identically. All amounts provided for in the Budget for the Professional Fund shall be in addition to any prepetition retainers paid by the Debtors to their professionals, and shall be deposited into an interest bearing trust account maintained by Bush Kornfeld, LLP, the Debtors' general bankruptcy counsel, for pro rata payment of allowed fees and costs to the Debtors' and the Committee's professionals, including any amounts payable pursuant to any other order entered by this Court authorizing interim periodic payment of professional fees, subject to final allowance of such fees and costs. To the extent the Professional Fund ultimately exceeds all allowed professional fees and costs of the estate, the remaining balance shall remain subject to the first priority security interests of the Senior Secured Lenders and returned to the Debtors for their benefit. Allison Decl.

## III.     **LEGAL DISCUSSION**

**A.**     **Use of Cash Collateral**

Section 363(c) of the Bankruptcy Code provides that:

(2)     The Trustee may not use, sell or lease cash collateral under paragraph (1) of this subsection unless,

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2206 20161 ci07f0000g
Case 18-13512-TWD     Doc 11     Filed 09/07/18     Ent. 09/07/18 17:36:38     Pg. 18 of 23

(A)     each entity that has an interest in such cash collateral consents; or

(B)     the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

The Debtors represent that they have insufficient funds to operate unless they use Cash Collateral, as they hold no unencumbered funds and do not have sources of unencumbered funds, and that the present circumstances require the Debtors to make use of Cash Collateral in order to maintain their ongoing business for the benefit of their estates and creditors. Id. The Debtors have an immediate need to use Cash Collateral to maintain, preserve and protect their assets and have provided for adequate protection of the Senior Secured Lenders' interests in the Cash Collateral, as described above. Additionally, the Senior Secured Lenders have consented to the use of their Cash Collateral in accordance with the terms of the Interim Order filed herewith and no other entities have an interest in the Cash Collateral, so the requirements of § 363(c) of the Bankruptcy Code are satisfied.

For these reasons, the Debtors respectfully request the Court authorize the use of Cash Collateral pursuant to the terms of the proposed Interim Order filed herewith.

**B.    <u>Adequate Protection</u>**

The purpose of adequate protection under Bankruptcy Code § 363 is to compensate a secured lender solely for the diminution in value of its collateral. Qmect, Inc. v. Burlingame Capital Partners II, L.P., 373 B.R. 682, 689-90 (N.D. Cal. 2007) citing In re Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 377, 108 S.Ct. 626 (1988)). Adequate protection payments are not to be used to compensate the creditor for lost interest or to provide lost opportunity costs. In re Weinstein, 227 B.R. 284, 296 (9th Cir. BAP 1998) citing In re Timbers. An equity cushion, standing alone, provides adequate protection justifying the restraint of lien enforcement by a bankruptcy court. In re Mellor, 734 F.2d 1400, 1401 (9th Cir. 1984). Adequate protection is not meant to be a guarantee that a

EMERGENCY MOTION RE: CASH COLLATERAL USE
AND POSTPETITION LOAN FACILITY – Page 19

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

creditor will be paid in full. Instead, the Court must determine whether the creditor's interests are protected as nearly as possible against the possible risks to that interest. In re Ernst Home Ctr., 209 B.R. 955, 966 (Bankr. W.D. Wash. 1997); In re McCombs Properties VI, Ltd., 88 B.R. 261, 267 (Bankr.C.D.Cal.1988)).

Based on the Vessel values discussed above, the Debtors assert that Senior Secured Lenders hold a substantial equity cushion as to their collateral. The Senior Secured Lenders question whether fair market values for the Vessels can be achieved in the present market or whether they would have an equity cushion in an orderly or forced liquidation. These issues do not need to be resolved at this time, however, based on the Senior Secured Lenders consent to the terms of the proposed Interim Order.

Additionally, as discussed above, in order to adequately protect the interests of the Senior Secured Lenders, the Debtors have agreed to grant the Senior Secured Lenders Adequate Protection Liens in Postpetition Collateral of the same type in which their prepetition lien attached to the Prepetition Collateral, in the same priority and validity as their prepetition liens, as necessary to secure the diminution in the Senior Secured Lenders' interests, if any, as a result of the Debtors' use of Cash Collateral. To the extent of any diminution in value ultimately due to Cash Collateral use not otherwise protected by the replacement lien granted herein, the Senior Secured Lenders shall retain their rights under section 507(b) of the Bankruptcy Code.

The Debtors have also provided for: i) payment of note rate interest to the Senior Secured Lenders during the case; ii) financial and other reporting; iii) maintenance of insurance on the Senior Secured Lenders Prepetition Collateral, and iv) establishment of a reserve fund to at least partially address fees and costs of the Senior Secured Lenders during the case. In this regard, the Budget currently projects no deterioration in the working capital collateral held by the Senior Secured Lenders

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

between the Petition Date and the end of the proposed Budget. Allison Decl. The Budget projects continued, normalized customer levels and payments. Id. Thus, the Adequate Protection Liens provide stipulated adequate protection of the Senior Secured Lenders' interests in the Prepetition Collateral.

Following a final hearing on full notice to creditors and other parties in interest, the Senior Secured Lenders will require entry of a final Order Authorizing Use of Cash Collateral containing certain additional customary terms for the Senior Secured Lenders' benefit.

The Debtors have an immediate need to use Cash Collateral to maintain, preserve and protect their assets and have provided terms for adequate protection of the Senior Secured Lenders' interests in the Cash Collateral, and on that basis the Senior Secured Lenders have consented to the use of their Cash Collateral. For these reasons, the Debtors respectfully request the Court authorize the use of Cash Collateral pursuant to the terms of the proposed Interim Order filed herewith.

## C. **Postpetition Financing**

Section 364(c) of the Bankruptcy Code provides that:

(c)    If the trustee is unable to obtain unsecured credit allowable under section 503 (b) (1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

        (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or, 507 (b) of this title;

        (2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or

        (3)    secured by a junior lien on property of the estate that is subject to a lien.

Section 364(d)(1) of the Bankruptcy Code provides that:

EMERGENCY MOTION RE: CASH COLLATERAL USE
AND POSTPETITION LOAN FACILITY – Page 21

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

    (A)    the trustee is unable to obtain such credit otherwise and;

    (B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

The Debtors are unable to procure the required funds in the form of unsecured credit or unsecured debt with an administrative priority. The DIP Loan is in the best interest of the Debtors' estates and creditors because it is the only means at this critical juncture of continuing operations during the Debtors' efforts to restructure their business to maximize value for the estate, to the extent the use of Cash Collateral proves inadequate. The circumstances of this case thus require the Debtors to obtain financing under § 364(c).

The terms of the DIP Loan reflect good faith, arm's-length negotiations between the Debtors and the DIP Lender, with input from the Senior Secured Lenders, as well as the Debtors' exercise of sound business judgment. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to obtain postpetition financing pursuant to § 364 (c) and (d) of the Bankruptcy Code.

**D.**    **Good Faith**

The proposed terms and conditions of the DIP Loan are fair and reasonable and were negotiated by the parties in good faith and at arm's length. Allison Decl., Stabbert Decl. Accordingly, the DIP Lender should be accorded the benefits of § 364(e) of the Bankruptcy Code with respect to the DIP Loan.

///

///

///

EMERGENCY MOTION RE: CASH COLLATERAL USE
AND POSTPETITION LOAN FACILITY – Page 22

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

# CONCLUSION

WHEREFORE, the Debtors respectfully requests entry of an order in the form of the proposed Interim Order submitted herewith, authorizing the Debtors' use of Cash Collateral as set forth herein, approving the DIP Loan, and setting a final hearing at such time as the Court may direct.

DATED this 7th day of September, 2018.

BUSH KORNFELD LLP

By    /s/ Armand J. Kornfeld
    Armand J. Kornfeld, WSBA #17214
    Aimee S. Willig, WSBA #22859
    Christine M. Tobin-Presser #27628
    Attorneys for Debtors-in-Possession

## CERTIFICATION REGARDING GUIDELINES REGARDING CASH COLLATERAL

The undersigned hereby certifies that the [Proposed] Order Authorizing Interim Use of Cash Collateral and Postpetition Loan Facility and Setting Final Hearing does not contain any of the provisions set forth in part A of Appendix A to the Local Bankruptcy Rules (Guidelines for Cash Collateral and Financing Stipulations).

DATED this 7th day of September, 2018.

BUSH KORNFELD LLP

By    /s/ Armand J. Kornfeld
    Armand J. Kornfeld, WSBA #17214
    Christine M. Tobin-Presser, WSBA #27628

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2206 20161 ci07f0000g